Thank you, Your Honor. I had intended to reserve three minutes for rebuttal, but maybe I will take advantage of Your Honor's hospitality and ask at the end for additional time if necessary. With that, again, for the record, my name is Joshua Engel and I represent the plaintiff and appellant Jane Doe in this case. May it please the Court, the right of a student to notice in an opportunity to be heard prior to the imposition of a lengthy suspension by a college or university is so well established that any reasonable official in the defendant's shoes would have understood that they were violating that right when our client was suspended for approximately 14 months without notice and without any hearing. In other words, Your Honors, the current state of the law gave the defendants fair warning that it was unconstitutional to suspend a student for an extended period of time without any notice, without any opportunity to be heard, without any opportunity to confront adverse witnesses, without any opportunity to see the evidence that was gathered against them. The District Court, Your Honors, we believe committed reversible error in concluding that the plaintiff did not have a clearly established, constitutionally protected interest in continued attendance at Sonoma State University. This decision was incorrect. It was incorrect because there is a robust consensus of cases around the country that a student facing expulsion or suspension from a public educational institution is entitled to due process protections. This is well established. I would suggest yes, Your Honor, and the reason I would suggest yes is because this robust consensus goes back all the way to the Dixon case, which was a Fifth Circuit opinion over 50 years ago almost. And that case was cited with approval by the Supreme Court in the Goss decision. But I would also add that this robust consensus exists in the First Circuit, the Fifth Circuit, the Sixth Circuit, the Seventh Circuit, the Eighth Circuit, the Tenth Circuit, and the Eleventh Circuit. Oh, you left out the Ninth. I did leave out the Ninth, Your Honor, but this court has said that there can be a robust consensus established from other circuits. And that is what we are talking about here today. Does the property interest here, though, have to come from California law? And if so, I'm not sure how the consensus in other circuits that are not talking about California law can help you. Well, let me answer that two ways, Your Honor. The first is that, yes, the property interest, if we go at a property interest approach, is recognized by California law. And there is a large number of cases in California that have recognized that due process protections are owed to the student. And it's alleged in paragraph 107 of the complaint that the student has a property interest because they were paid tuition and fees and therefore expected to continue their education. Which case do you have from California that happened before this episode? What's your best case from California Supreme Court? Well, I would refer, Your Honor, to paragraph 25 of our brief where we mentioned a number of California cases. Which is your best case from the California Supreme Court that occurred prior to this episode to bolster your case? I'm not sure there is a Supreme Court case that specifically holds that there is a property interest in California on that. There isn't? I don't believe so, Your Honor. Is that significant? No, I don't believe that is, Your Honor, and I'd say so for two reasons. First is, when you're talking about a property interest, there is case law establishing that the relationship between the student and the school is contractual in nature. But, more importantly, I think you don't need to reach this property interest to find that there is an interest that is cognizable under the 14th Amendment of the Constitution. There is also a liberty interest at stake here, and that is the freedom to pursue occupation of the student's choice. The appellant alleged in paragraph 108 of the complaint a stigma plus basis for a constitutionally protected liberty interest. And do you have a California Supreme Court case for that proposition before this episode took place? No, we do not, Your Honor. Thank you. I may interject. I had a couple of questions. One is just factual. At the time that Jane Doe was suspended without giving her notice and opportunity to be heard, had she previously paid tuition to the university and attended classes? Yes, she had, Your Honor. So, she was in the middle of a how many-year study program that hadn't been completed? I believe it was a two-year program, Your Honor, in psychology. So, she had had a year, and then they suspended her? That's correct, Your Honor. Okay. And she did not go back? My second question relates to the legal issue that I think may be underlying Judge Wallace's inquiries to you. We just look at the contract interest and not at stigma plus and consider that basis alone. I take it our job is definitely to decide what California law is. Correct. That is, Your Honor, to some extent. I would say that when you're looking at whether there is a contract interest, the federal courts and this court have not necessarily strictly looked at state law, but have determined whether there is an expectation of the student under that state law. I understand that argument, but let me go back to the question that I wanted to ask you. If the Supreme Court of the state has not acted, if they've been silent, can a right be clearly established by the weight of authority in the intermediate appellate courts? Absolutely, Your Honor. I would suggest that the California courts have spoken, the intermediate appellate courts certainly have spoken unequivocally on this issue. They have on a number of cases, a number of times, said that students at California institutions have certain due process rights. And they would not reach that question if they had not found or assumed it was so obvious that they didn't even need to go into an in-depth analysis that there is such a property interest that the students possess. How many intermediate court of appeals have done that? There are a number, Your Honor. There is a recent decision that came out, and we can submit a supplemental authority on it, the Knight decision, that lists a large number of those decisions. That decision came out, I think it was last week or the week before that. But there are a significant number, and we list some on page 25 of our brief, that hold that students have such a property interest, or I shouldn't say that hold it as a property interest, that hold that students have a constitutionally protected interest that was violated by certain school procedures that did not provide them either notice of an opportunity to be heard, notice of the charges that were pending. I think most notably a couple of California intermediate decisions providing that students have a right to confront adverse witnesses during school disciplinary proceedings. And you would not have that holding if the court did not believe that there is a property or liberty interest at stake. What do you do with Paulson from the California Supreme Court that actually expresses skepticism about treating the student-university relationship in contractual terms? What I would suggest, Your Honor, is there's two ways of looking at that. The first is that when you're talking about what type of interest is at stake here, I think the skepticism in that case is treating it like enrolling in a great courses lecture, where you are paying for credits from the school. And I think the better analysis is to suggest that the student is not paying only for credits from a school or to attend a certain class, but with the expectation that they will receive a degree if they play by the rules, work hard, and do what they're supposed to do, and that would be over a length of time. Second is, I don't think Your Honor needs to reach that decision because you certainly could rely on the liberty interest that's at stake. And that liberty interest that's at stake, as we described, is that stigma plus interest as well. So there's more than one way to get there. And Mike, I guess I have a question on this stigma plus, and that is, if the suspension was not published, then notice that she was suspended wasn't circulated by the university. That wasn't put in the papers, you know, wasn't sent in a memo to all the students in the class. Can you establish stigma plus in the absence of some kind of express publication? Yes, Your Honor, in a couple of ways. First, the complaint in paragraph 108 indicates that the plaintiff's good name, reputation, integrity was damaged merely by this suspension. And if you think about what that suspension would look like, there would be a gap in her record that she would have to explain. There would be in a small type of class like this, there would be notice about what was going on and why the student was suspended. The stigma plus claim turns on reputation and whether reputation was damaged. And it doesn't turn on whether there is a particular entry on a student's transcript, for example, that they were suspended or that they were suspended for a period of time. But just the fact that their reputation was injured somehow by the school's actions. If the reputation is injured with a number of existing students in the class, is that sufficient or does it have to be injured in the minds of the general public? I would say it would have to be. There's a middle ground, Your Honor, which is it doesn't necessarily have to be the general public. It is sufficient if it would be people who would be involved in their field of study. So in this type of program where you have a very small number of students and a very small number of faculty, and especially in a graduate program where you're relying on the recommendation of your faculty advisors in order to get jobs down the road, being damaged within that community is sufficient to trigger the stigma plus test. But she was eventually vindicated. So within that community, wouldn't they know that she was found not to have done the alleged charge? They would also know that it was thought to be serious enough that she was put on the bench, so to speak, for 14 months, that she was not able to participate in her program. Her ability to proceed in her program was so damaged she was never able to get her degree in this case even. Can I ask you about that? It seems like your theory is that this suspension was really an expulsion. Do you have case law that supports that jump in logic? No, there is no case that's had it. But I think that seems to me not a problem for us. I don't think the court needs to, and courts haven't been called on to precisely define the line beyond what the Goss decision did, which was defining a line of 10 days or so. Here you have 14 months. I think your claim is that she needed the process before the suspension began. So how is a school supposed to know? I think your claim is that she needs the process before the suspension began. And I think you've also said that a short suspension wouldn't trigger the same concerns. So how is a school supposed to know before the fact whether they need to give the process or not? The school, your honor, should know that before you impose any kind of lengthy suspension on a student, you have to have some kind of process. But what if they don't even know if it'll be lengthy? I think the facts of this case are particularly strong for you on whether it needed to be so lengthy, but there could be circumstances where they don't know if they need DNA testing and it'll take a while or they have to retest. You can imagine lots of kinds of investigations that might not be predictable in advance about how long they'll take. Yes, and Judge Gould, if I may, I know I might go over on my answer if that's okay. So here's how Judge Friedland and I would answer your question, which is to say that, first, it is not necessary to decide where that line is to decide this case in favor of this appellant. The line, to say that the line is somewhere between 0 and 14 months or 0 and 9 months even or 0 and 6 months, certainly we are on the right side of that line. If your honor, though, is looking for some instruction to give the school, I think there's an obvious answer there, which is that the school could impose some kind of interim suspension with two conditions. The first is that interim suspension would have to be tied to some sort of belief that there is a need for immediate action. And remember, in this case, there was no immediate action. The incident happened and the student wasn't actually suspended until months later. But more importantly, and I think to directly answer your question, Judge Friedland, of what the school would need, is the school should have the ability, I would concede, to suspend a student for the length of time it would conduct the investigation. Now here, and this is where the facts of this case become really important, here the investigation was essentially completed within about a month after the allegations were made. The students had all been interviewed, the plaintiff had been interviewed, the school, the professor who was in the room had been interviewed. This was all completed within that period of time. And let me add one other thing. I don't understand you to be bringing a challenge to the fact, in and of itself, that they continued the suspension after they had really completed the investigation but just didn't admit it. It seems to me that your argument, if I understand it right, is about not having processed before the suspension even began at all, and the investigation really began at all in some sense. And if that's true, then I'm not sure what the point is of talking about the fact that they really did the investigation faster than they admitted. There are two components to Your Honor's question, I think. To answer the last point is, I mentioned the length of time to illustrate the fact that, to answer Your Honor's question about how long or what the school would want to know in the abstract, about how long one of these things would go, and I suggested that the suspension that the school can impose on an interim basis probably should be limited, to answer Your Honor's hypothetical, to the length of time it conducts the investigation. And here we went well beyond that. But when you talk about our claim, it's important to know there was no suggestion and no finding anywhere in the record that our client posed any risk to the community or the safety of any other person, that this was a suspension that was imposed significantly after the fact. So can we imagine? I don't understand the after the fact part either, because you could have a lot of kinds of allegations that would cause a suspension or expulsion to be posed after the fact, because it took a little while for someone to complain. I think it took a little bit of time for the students to raise the complaints. Now I know you think the complaints were frivolous, but I don't understand why the after the fact really matters, given that sometimes it takes a complainant some time to complain. Well, I'd suggest to you, Your Honor, that's not this case. Here the complainants complained fairly early on, and the suspension, I believe they complained in May or June, and the suspension wasn't actually put in place until August. But in between there was an interview, so probably the university will argue that the interview itself was some process. They could argue that it's some process, but it's certainly not the type of constitutionally protected process that you'd want to see before you impose a significant suspension or the equivalent of an expulsion on a student. There was no neutral decision maker. There was no notice of the charges. There was no access to evidence prior to whatever process it is. It's certainly not a hearing. More importantly, there was no ability to question adverse witnesses and no ability of the hearing officer, whoever that would be, to assess the credibility of those witnesses. So the suggestion that conducting an interview is the functional equivalent of a hearing I think doesn't go very far. But if the university thought it would only take a month to resolve this, so at the time they did that interview, if they thought the suspension would only last until, say, mid-September, would everything have been fine? Well, the university had given itself 60 days, and I would suggest no to answer the question directly. It seems to me that if you're going to, and I think the law supports this,  you have to give them at least notice and an opportunity to be heard. Now, what that notice and opportunity to be heard looks like may be different than your final hearing. And whether it was adequate under the Matthews test is a question that I think would have to be decided on a case-by-case basis perhaps. But that's not this case. In this case, there was no hearing whatsoever. So there's no opportunity for the university to come here and argue before this court and say, well, we gave her a hearing before she was suspended that would satisfy the Matthews balancing test. It just didn't happen here. And so we don't have to parse that hypothetical necessarily. I don't want Your Honor to think I'm dodging your hypothetical either as well. Well, we've let you go over your time substantially. But I think we should probably bring the appellant's argument to a close and then we'll give you two minutes of rebuttal time. Thank you, Your Honor. So now, unless there are further questions, Mr. Engel now as well as Judge Friedland will proceed to Mr. Hardinger's argument on behalf of Timothy White. Mr. Hardinger, you're on mute. I can't hear you. Thank you. I'm sorry about that. Let me just get set up in my location here. Mr. Hardinger, I'll just say that because we're giving Mr. Engel extra time, you certainly can have the equivalent time if you need. Thank you very much, Your Honor. I appreciate it. May it please the court, Arthur Hardinger of the Ready Public Law Group representing the defendants. I think that the argument needs to come back to the undisputed specific factual context of this case, which has been somewhat discussed by my colleague. Here, three students lodged a formal complaint of sexual harassment, undisputed. The plaintiff was notified of the charges. In a letter, that's at paragraph 64 of the complaint, and she had a three-hour interview at paragraph 68 of the complaint. And that's where she was provided the opportunity to respond. She had heard the charges, and she's responding in the course of an interview. She was taken out of the classroom as an interim remedy, which as we know, at least in an employment setting, is common. You separate the complainant and the victim while you sort it out. That's a very common practice, and it's the best practice, while the facts are being sorted out. The plaintiff was exonerated, as has been mentioned by the court. That determination was appealed, again, by the complainants. The chancellor who sued here denied the appeal. And again, the plaintiff was exonerated. So I think the other point of these cases I would press upon the panel is that the university, in these cases, is really between a rock and a hard spot. I mean, addressing the interests of the victim and addressing the interests of the subject. And in any one of these cases, the investigation is either too rushed or it took too long. That's just the practical reality. I don't understand how this one is even close to not too long. It seems like there were, like, four people who needed to be talked to, no DNA, one incident. I don't understand how this couldn't have been wrapped up in two weeks. Can you explain how it possibly took 14 months? Sure, and, of course, I'm confined to the record. And I come back, if you would, to the principle there's always an allegation it's too rushed or it's too long. So this one is a lengthier investigation. You had a person terminate employment. You had a person go on parental leave. You had a person take a personal leave. You had a firestorm with the Tubbs Fire right in the middle of this. So there were things that were going on that could explain it, but you don't need to get there. You don't need to get there in the context of what the issue is here, the core issue being qualified immunity. But I would note, Your Honor, we cited at page 53 several cases where in the context of a due process setting, you had delays of 11 months, 19 months, 20 months, where qualified immunity in that context was still provided because it didn't violate the due process principles in play in that particular setting. So I'm not going to argue with you that this is a lengthier investigation, but if you come back to the qualified immunity analysis, was it clearly established in the Ninth Circuit that the subject of a Title IX sexual harassment complaint in graduate school has a constitutional right to continue enrollment while the investigation is pending? There's not a single case that— So I think that framing mixes up the process with the property right. It seems like first we have to talk about whether California gives a protected property right to students in their enrollment, and then we can talk about whether, as a process matter, during an investigation or suspension, someone should be allowed to have classes or not, or how long it could take. But focusing just on whether there's a property right and not blending the two together, I think you'd have to convince us that if there's no property right that's known in California, that means that a California school could just arbitrarily suspend or expel anyone they want to without having a federal constitutional problem because there's no protected property right. Is that really what we should decide? We don't need to get there, again, because if you just come back to the survey of the case law that the district court looked at, you come to the conclusion that this is not a settled area of law. But what that means is there's no right to not be just arbitrarily expelled. There is no right to impose individual liability on the individual school officials in this setting because that right has not been established either by the California Supreme Court or recognized in the Ninth Circuit Court of Appeals. So is there some other remedy available to a plaintiff like this? Sure. She could have sought a petition for writ of mandamus under CCP Section 1085. She could have sought a writ of mandamus. I'm not familiar enough with that. Would that just get her the ability to be back enrolled, which I guess was already true by the end of the 14 months? Yes. So that doesn't really help her deal with the fact that she was kicked out for 14 months in her view for no reason. So what other remedies are there? Well, if I might, it's an extraordinary remedy that is held on an expedited schedule, so it's very quick. You can go into court and get a 1085 writ on a very quick schedule. So do you think she should have done that after one month of the investigation? That's ultimately up to her. I mean, remember, she has her own interests. The college is balancing the interests of the complainants versus hers. If she thought that she needed to be back in school in one month, yes, she should have sought a writ. That would have been a state court remedy that would have been available to her. Counsel, let me interject a question, if I may, please, just briefly. Could she make a claim against the university as opposed to the officials in the sense that normally, like the entity itself, would not have a qualified immunity just for the officials, but the state may have sovereign immunity? Right. And I believe the college, there's not a Section 1983 claim that would lie against the college. But the state court claims could. A lot of these cases go to state court, really. I'd come back again. Sorry, is there any remedy for damages available in state court for someone like this? I believe that those mandamus remedies could, not 100% certain, could provide some form of remedy. For example, if you say I had a right to attend class, I paid for it, not letting me attend class, so you have a duty to refund my money. Had she already paid for the year that she couldn't attend? Yes, but I think this is outside the record. I want to be cautious. I believe that was refunded. That became a non-issue. But again, I come back to some of the questions that were asked earlier. Supreme Court's never reached the issue. Ninth Circuit's never reached the issue. You have a case as of 2019, the Austin case, saying qualified immunity lies in this context because it is not beyond constitutional debate whether there's a continued right to enrollment in this post-secondary educational setting. That's just the state of the law. I don't think you need to go beyond that. And I think if you look at the district court's ruling, where she methodically goes from circuit to circuit, she looks at the Supreme Court, the Ninth Circuit, circuit to circuit, and distinguishes the robust authorities that my colleague relies on because those all make the assumption that due process applies. They specifically don't reach the issue because courts are taught by Justice Brandeis' view that you avoid establishing a constitutional principle if you can reach an outcome the other way. And that's what happened in those cases. And that can't constitute a robust consensus that would fairly put someone on notice that what they're going to do, if I go on a leave, if I terminate employment, I'm going to subject myself to individual liability under Section 1983. I don't think you could possibly get there. The cases are all over the map. And I do want to come back to, you know, my colleague cited Taylor v. Riojas, and he's developing this principle that you just need to be on fair notice and you don't need to necessarily have particularized facts that would guide you as a prior precedent to put you on fair notice. And I believe that that is incorrect in the sense that that line of authority, which comes from the Hope case, as we know, comes in these sort of extreme examples where it's sort of, I use the phrase, res ipsa loquitur, the thing speaks for itself. In the Eighth Amendment context in Hope, if you shackle a prisoner like a dog to a hitching post, you know, you kind of, after the prisoner has given up, that's wrong. That violates the Eighth Amendment. And the Taylor case, again, emphasizes that, hey, I don't need a case specifically on all fours when the facts here are that you threw me into a cell covered with feces for six days. That's wrong, and there's enough analogous case law out there that I can rely upon to conclude that qualified immunity is defeated. So I wanted to also say, finally, this is, again, qualified immunity to me is just crystal clear. If you just look at the legal landscape and you realize and accept the reality that this is a quickly and complicated, evolving area of the law, where universities, colleges are struggling to balance the rights of the people involved, and this issue of extending Goss versus Lopez to the secondary, post-secondary education never has happened. But you don't need to reach that issue because the qualified immunity issue is clear. And in terms of deciding where I think my colleague would like you to go, which is let's extend Goss versus Lopez, which is relied upon throughout his briefing, into the post-secondary setting, that issue was barely briefed here. The issue really is the kind of is the law settled such that it would provide fair notice? Is the law settled? Is the constitutional issue beyond date? That was the issue. And so the focus was not on whether that principle, whether the constitutional principle of a right to continued employment should extend into post-secondary education. And I think that the court would benefit from robust briefing on that before going there. And it's just not here. This issue is not presented in this case. Counsel, just to follow up on your suggestion there of what might be a benefit to us. Would it benefit the court for the court to order supplemental briefing on the issues that you noted on whether Goss extends to this context of the college or on the issue of constructive expulsion, which you gave some argument earlier that there was a process here that may bear on that. But the briefs, at least as I understand it, seem to focus almost exclusively, maybe as they should, on the issue of clearly established law. And so some other issues were not reached. I don't think this is the case that you would want us to go there because there's no factual record. There are explanations in terms of what happened in this case that I was asked about earlier. And it doesn't matter in the sense that you have to, I think, fairly reach the conclusion that the district court got it right. Let me ask another question, Gene. And by the way, we'll ask the courtroom deputy to add five minutes to the clock for Mr. Hartinger so he can plan and realizes that I'm not usurping his final eloquent arguments with my question. The question I have is this. Have the parties here explored mediation? I don't believe that we have. And I would admit when my colleague filed to defend, he might reaffirm or set me straight. But I don't believe that we have. Okay. Okay, thank you. So I appreciate the extra time. But I was really just coming to the conclusion that, again, the principle of establishing a constitutional right versus determining whether qualified immunity provides a valid defense and whether the district court's opinion should be affirmed are— courts have taught us to go to the issue where you don't have to establish a constitutional right. And why not leave that to a day where there's a developed record, where you have, you know, again, a Niki Curie briefing on that important principle? Here, it's crystal clear. I wonder whether we are even capable of resolving this question because it's really— the threshold question is a California law question. And it seems best resolved by the California courts, not us, because we can't really resolve California law ourselves anyway. I can't disagree with that. And with that, I would conclude. Thank you for the extra time. Okay, I have one more question for you. If I may, counsel, sorry to do this, but what would your client think about the idea that our panel could certify a question to the California Supreme Court, which, of course, doesn't always accept certification because they are so busy, but what would you think about us tendering a question to that court? I don't think, from my perspective on behalf of my clients, it's unnecessary. Qualified immunity is settled. Federal question, rather. And so the question of qualified immunity is properly before you. And that's a question that's resolved easily once. Okay, thank you. Thank you very much. Okay, so Mr. Brunchard did not use all the time we'd given him, so I guess we're going to give you that time, Mr. Engle, to let you not use all of it, but give you another two minutes of rebuttal. I appreciate that, Your Honor. Your Honor, let me suggest to this court that the issue of California law is only half of it and that counsel suggested that we are asking you to extend GAS, and in a sense, he's right. The GAS decision, as I noted in my previous argument, relied on Dixon, which was a case involving higher education and referred to that case as a landmark decision. So you, I would suggest one solution is you don't need to reach the issue of California state law because under federal law, under GAS and Dixon, the plaintiff's allegations, and again, we're on a motion to dismiss, so taking them as true and construing them in her favor, she has plausibly alleged a constitutionally protected liberty interest sufficient to survive a motion to dismiss. In GAS, the Supreme Court, again, citing to the Dixon decision, said that where a person's good name, honor, or integrity is at stake because of what the government is doing to him, the minimum requirements of due process must be satisfied, and that school suspensions based on charges of misconduct that could seriously damage a student standing with their fellow pupils and their teachers, as well as interfere with later opportunities for higher education and employment, constitute a constitutionally protected liberty interest. Now, my learned colleague's suggestion that the school is in between a rock and a hard place, and I'm out of time, Your Honor, but if I may have an additional minute, I'd appreciate it, I know. One minute. Sure. This is not an onerous burden, but you're asking them not to have a criminal trial, but simply a hearing, a hearing where evidence could be presented, and I would suggest to Your Honors that the touchstone of our constitutional law and the idea that this is an extreme case is apparent on this record, because what we want to avoid, and I believe it was Judge Friedland's question asking about arbitrary actions, what we want to avoid is for the schools to take away from this court's decision in this case that they can act like a star chamber where significant penalties or restrictions can be imposed on a student based on mere allegations, a mere allegation, for example, that someone was dancing like a snake or that they were masturbating in class, an allegation that turned out to be true and is frankly ludicrous on its face. And so the idea that these types of unfounded allegations could lead to significant penalties and restrictions on students is anathema to this law. I think you just said an allegation that turned out to be true. I thought you meant untrue. Untrue. If I said true, I completely misspoke, Your Honor. These allegations are completely untrue, and I think that's the core of it. Now, before you sit down, could you address the issue that I asked Mr. Hartinger? Let me know from your client's point of view. First, would there be any merit to mediation? I guess I asked if the two of you had mediated. You may know that. Let me answer the question two ways, Your Honor, if you'll indulge me. First is, there was no mediation in this case. Second is, in other cases, including cases that have been before other circuits I've had, in this exact same situation, mediation has proven helpful under the court's mediation authority. And so if the court certainly suggested we go there, we would do what the court said. If we decided to give the opportunity, it would be entirely voluntary, and we wouldn't mediate unless both parties wanted to do it. And the circuit mediator would advise us if both parties weren't amenable to it without identifying someone who said nay. Now, also, I asked a question about certification, and I wonder what you think about whether we should certify a question to the California Supreme Court. Far be it from me. If the court thinks it would be helpful in the court's analysis of this question, then I'm not going to suggest otherwise. However, I would suggest that there is certainly, within the lower appellate courts in California, a consensus that has developed. Okay, I think we understand that argument. I'll just say we submitted four cases on the briefs, so we can give both of you some extra time. I think, Mr. Engel, we've given you lots and lots of time, so we should bring the argument to a close. Now, I'm going to thank you both again, Mr. Hartinger, Mr. Engel. You both presented excellent arguments on a very difficult issue, at least for me, and these cases are never easy to resolve, especially when they have implications for an allegedly injured party and also for a university system that has to balance considerations of all the students and other obligations. So I thank you both,  and if the court wants to issue a supplemental order or an order for anything before we decide the case, the court would do that. Okay, thank you both. Unless one of my colleagues has a comment or observation or question, this case shall be submitted. Thank you for your concern. Thank you, Your Honors. Thank you.
judges: Wallace, Gould, Friedland